UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

TIFFANY RILEY,

    Plaintiff,

v.

WINDSOR SOUTHEAST SUPERVISORY
UNION, MOUNT ASCUTNEY SCHOOL
DISTRICT BOARD, DAVID W. BAKER,
ELIZABETH BURROWS, AMY
MCMULLEN, BETH CARTER, KRIS
GARNJOST, NANCY PEDRICK, and
BILL YATES,

    Defendants.

Case No. 5:20-cv-108

**ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 39)

This case arises out of the termination of Tiffany Riley's employment as principal of the Windsor School. Plaintiff seeks summary judgment on three issues:

- That the Mt. Ascutney School District Board (the "School Board") dismissed her from employment on June 12, 2020;

- That the sole basis for the dismissal was two Facebook posts by Plaintiff; and

- That the School Board failed to hold a hearing pursuant to 16 V.S.A. § 243(d) when requested.

(Doc. 39 at 1-2.) None of these issues is dispositive on any count of the complaint. Instead, the motion seeks to narrow the issues at trial concerning the date of termination of Plaintiff's employment and the reasons for it.

Fed. R. Civ. P. 56(a) permits a party "to move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."

"This language was added to the rule in 2010 to make clear that summary judgment may be requested not only as to an entire case, or as to a complete claim or defense, but also as to parts of claims or defenses." 11 Moore's Federal Practice – Civil § 56.122. The court's review of the factual record and the application of the law remains the same whether a party seeks summary judgment on a single issue or the entire claim. In either case, the court does not weigh evidence or determine the truth of the matter but instead asks if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court considers the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in favor of that party. *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019).

## Facts

From 2015 until June 2020, Plaintiff served as principal of the Windsor PK-12 School in Windsor, Vermont. She was hired for this position by the School Board. The Board supervises the activities of the Mount Ascutney School District (the "District") pursuant to 16 V.S.A. § 563. The District lies within the Windsor Southeast Supervisory Union. Defendant Dr. David Baker is the superintendent of the Supervisory Union. (Doc. 41 ¶¶ 1–4 (Plaintiff's Statement of Undisputed Facts ("SUF")); Doc. 53 ¶¶ 1–4 (Defendant's Statement of Disputed Material Facts ("SDMF")).) Dr. Baker supervises the work of the principals employed at schools within the Supervisory Union.

Plaintiff and the District entered into a written contract which governed her employment during the 2019–2020 school year. (Doc. 41 ¶ 5; Doc. 53 ¶ 5.) In April 2020, Plaintiff and the District entered into a new contract extending her service as principal through June 2022. (Doc. 41 ¶ 6; Doc. 53 ¶ 6.)

The spring of 2020 was a challenging time for many organizations, including the Windsor School. Due to COVID-19 health concerns, the school shifted to remote learning on March 17, 2020 and continued that practice until the end of the school year in June. Plaintiff herself became ill with COVID-19 and was hospitalized between March 26 and April 1, 2020. (Doc. 41 ¶¶ 7–11; Doc. 53 ¶¶ 7–11.) She returned to work on April 2, 2020. (Doc. 41 ¶ 12; Doc. 53 ¶ 12.)

In May and June 2020, the Black Lives Movement ("BLM"), which had been active since 2013 concerning issues of racial equity and police conduct, gained new prominence following the death of George Floyd. (Doc. 41 ¶¶15–16.) Defendants neither admit nor deny this statement and limit their response to a statement that it is immaterial to this case. (Doc. 53 ¶ 15.)

On June 10 and 11, Plaintiff posted two statements on her personal Facebook page. These posts lie at the heart of this case. The first post appeared on June 10, 2020 in the evening hours. It read:

> I firmly believe that Black Lives Matter, but I DO NOT agree with the coercive measures taken to get to this point across; some of which are falsified in an attempt to prove a point. While I want to get behind BLM, I do not think people should be made to feel they have to choose black race over human race. While I understand the urgency to feel compelled to advocate for black lives, what about our fellow law enforcement? What about all others who advocate for and demand equity for all? Just because I don't walk around with a BLM sign should not mean I am a racist.

(Doc. 41 ¶ 17; Doc. 53 ¶ 17.)

Following phone calls and texts from Superintendent Baker, during the evening of June 11, 2020, Plaintiff replaced the June 10 post with the following statement:

> While self reflecting, researching, learning, and trying to make myself more aware of the struggles of the BLM movement, I recently made a public post that unintentionally offended many people. I understand the struggle of the black lives community and stand with them in the fight against racism. Prejudice, discrimination and racism has no place in the world. I love and support my

3

community and will continue to reflect on, learn from, and continue to pursue equity moving forward.

(Doc. 41 ¶ 20; Doc. 53 ¶ 20.)

On June 12, 2020, the School Board met in emergency executive session to discuss its response to the two posts. (Doc. 41 ¶ 21; Doc. 53 ¶ 21.) Immediately following the meeting, Superintendent Baker sent a letter to Plaintiff:

> Dear Ms. Riley:
>
> I regret to inform you that the Mount Ascutney School Board at their meeting on June 12th, 2020, indicated no confidence in your leadership at the Windsor School. They want me to enter into negotiations with you about a suitable severance package and a resignation from you. They see no path forward for your leadership at the school given your recent post on Facebook and subsequent reaction to that post. Effective immediately, the Mount Ascutney School Board is placing you on paid administrative leave while we negotiate an exit strategy.
>
> While on leave and until further notice you are to have no contact with staff or students in the Windsor Southeast Supervisory Union. Any correspondence must be between you and me and, should you secure an attorney in the future, he/she would communicate with Pietro Lynn, our attorney.
>
> I will reach out to you to find a reasonable time for us to talk about a reasonable severance arrangement.

(Doc. 4-3.) Superintendent Baker gave an interview to the Valley News, a local newspaper, a few days later. He stated "[The members of the School Board] don't see any way that [plaintiff is] going to go forward as the principal of that building given those comments and that statement. It's clear that the community has lost faith in her ability to lead." (Doc. 4-4; Doc. 53 ¶ 33.) He explained, "I felt like a [Facebook] post like that, with those kinds of racial overtones and what I define as pretty much outright racist in my values system, she would never have posted that." (Doc. 53 ¶ 34.)

4

On June 12, 2020, the School Board itself issued a written statement:

Dear Parents, Caregivers, and Staff,

The Mount Ascutney School District Board was uniformly appalled by Principal Tiffany Riley's recent Facebook post, which stated:

*"I firmly believe that Black Lives Matter, but I DO NOT agree with the coercive measures taken to get to this point across; some of which are falsified in an attempt to prove a point. While I want to get behind BLM, I do not think people should be made to feel that they have to choose black race over human race. While I understand the urgency to feel compelled to advocate for black lives, what about our fellow law enforcement? What about all others who advocate for and demand equity for all? Just because I don't walk around with a BLM sign should not mean I am a racist [sic]"*

The ignorance, prejudice, and lack of judgement in these statements are utterly contrary to the values we espouse as a school board and district. However, these statements were not alone. They were followed later by a follow up Facebook post, which acknowledged no culpability, expressed no specific contrition or empathy, and showed no humility. Because of this glaring miscomprehension of the situation, we feel unanimously that Ms. Riley's continued role as our school leader damages the school and its students.

Ours is not a racially diverse school, so it is easy to forget or to be unconscious of the racial inequities that exist in the form of White Privilege in our community and our state. If we are not acknowledging White Advantage and working to remove it, we are not attempting to provide our minority students an equal opportunity for education. If we are not teaching all our students that bias exists in our community and working to remove it, we are complicit in its perpetuation.

We have expectations of the leaders in our schools – that they will strive to embody education as a living, fluid concept, one that encompasses listening, learning, and teaching as equal partners. We speak of creating lifelong learners, but as leaders, we must also continually listen and learn. There are expectations of trust, knowledge, honesty, and thought that are not present in everyday conversation. It is our responsibility to be aware of that, especially in our public statements.

Although we recognize Ms. Riley's meaningful and positive impact on Windsor School, we have voted unanimously to place Ms. Riley on paid leave, effective immediately, and we are resolved that she will no longer lead our school.

(Doc. 9-5; Doc. 53 ¶ 39.) The statement was signed by all six members of the School Board.

The School Board distributed it broadly through email to students, parents, caregivers, and staff

5

at the Windsor School. It was published on the Windsor Southeast Supervisory Union website. (Doc. 41-1 ¶ 26; Doc. 41-4; Doc. 53 ¶¶ 40–42.)

On June 13, 2020, Plaintiff sent a letter to the School Board apologizing for her Facebook posts and requesting reinstatement. (Doc. 41 ¶ 49; Doc. 53 ¶ 49.)

On June 14, 2020, Vermont Digger, an online newspaper, published a story about the controversy that included a statement from School Board Chair Elizabeth Burrows. She stated, "We do not intend to hire [plaintiff] back" and "We wanted to make sure we acted as quickly as we possibly could." (Doc. 41 ¶¶ 50–51; Doc. 53 ¶¶ 50–51 ("Undisputed. Disputed that Board Chair Burrows statement supports Riley's claim that she was actually or constructively discharged on June 12, 2020.").)

On June 14, 2020, the School Board invited Plaintiff to attend a meeting on June 15, 2020. She declined to attend. (Doc. 53 ¶ 49; Doc. 53-1 ¶¶ 12–18 (Burrows Aff.).)

On June 25, 2020, Plaintiff's attorney William Meub submitted a request in writing for a hearing pursuant to 16 V.S.A. § 243 to be convened within 15 days. (Doc. 41 ¶ 57; Doc. 53 ¶ 57.)

In addition to these undisputed facts, defendant has supplied an affidavit from the School Board Chair Elizabeth Burrows which describes later events. (Doc. 53-1.) The court accepts Ms. Burrows' account as true for purposes of the motion for partial summary judgment.

The Burrows affidavit describes an episode involving the June 2020 graduation at the Windsor School. These are described in an email she received from Plaintiff on June 11. Plaintiff described the painting of an American flag on the lawn near the school as part of the graduation celebration. A former student of the school living with town residents Kabray and Erin Rockwood requested that the school remove the flag. Although the email is not explicit on

6

this point, the court understands that the removal was requested in light of nationwide protests following the death of George Floyd. Plaintiff and other school administrators, including the Superintendent, discussed the request and turned it down. The day before graduation Erin Rockwood asked that the school paint a BLM flag on the school grounds. Plaintiff discussed this request with another administrator and turned it down as well. On the day of graduation, Friday, June 5, the former student sent an email asking Plaintiff what measures the school would take to support the BLM movement. Plaintiff's email states that she was "straight out" with preparations for graduation and did not see it until the next day. It concludes by stating that she was distressed by critical emails accusing her of not doing enough to address issues of racial inequity. (Doc. 53-1 at 1–2.)[1]

On July 6, 2020, Plaintiff appeared at a School Board meeting under "threat of insubordination." (Doc. 53 ¶ 58.) The meeting did not result in her return to the duties of her employment.

The Burrows affidavit denies that plaintiff was terminated on June 12. Chair Burrows insists that the Board's action was confined to placing her on administrative leave and that no final decision was made until the Board meeting on July 27, 2020, when the Board voted to terminate her contract. (Doc. 53-1 ¶¶ 8, 31.) At that meeting, the Board identified 5 grounds for termination:

1. Ms. Riley posted statements on social media that were inconsistent with the expectations for a principal.

---

[1] This account of the BLM flag controversy does not reflect Plaintiff's version which is that Superintendent Baker declined to display the flag. Amended Complaint, ¶ 21. It also does not reflect emails described in the parties' briefing which indicate that prior to the graduation, plaintiff requested that the former student supply a BLM flag. The court is satisfied that it has adopted the version of events described by the Chair of the School Board in her affidavit and that her affidavit represents the record on which defendants believe the motion for partial summary judgment should be decided.

7

2. Ms. Riley failed to take down the statements when asked to do so by her supervisor.

3. Ms. Riley failed to coordinate subsequent posts despite requests that she do so by her supervisor.

4. Ms. Riley failed to disclose to the Board important information concerning interactions with families regarding equity issues.

5. Ms. Riley failed to exercise sound professional judgment in connection with the interactions with the community, her supervisor and the Board concerning issues having to do with a request for a BLM flag at graduation, social media posts and her subsequent conduct.

(Doc. 53-1 ¶ 31.) On September 10, 2020, the Board conducted a full-day termination hearing. On October 14, 2020, the Board issued a 44-page unanimous decision terminating Ms. Riley's employment for the reasons previously identified by the Board on July 27, 2020. (*Id.* ¶ 58.)

## Analysis

In ruling on the motion, the court will consider each cause of action separately. It will identify the elements and determine whether the undisputed facts are sufficient to meet the plaintiff's burden of proof on some aspect of the element. In this way, the court intends to avoid general declarations which do not narrow the proof at trial. If these efforts are successful, the court and the parties will both understand what remains to be tried and what is not actually in dispute.

### I.     Count One – Declaratory Relief

Plaintiff seeks a declaratory judgment that "as a matter of law, Plaintiff was dismissed/terminated on June 12, 2020, based on Dr. Baker's June 12th Letter to the Plaintiff, the School Board's June 12th Public Statement, and the public statements made by Dr. Baker and members of the School Board to the press." (Doc. 9 ¶ 52.) The court addresses the issue of whether Plaintiff was terminated in the context of the damage claims below. Because Plaintiff has a damages remedy and has filed suit on several causes of action, declaratory judgment is not

8

the appropriate remedy. The declaratory judgment procedure "gives a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy and in cases in which a party who could sue for coercive relief has not yet done so." Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2751 (4th ed. 2020). The court reaches this conclusion in an exercise of discretion. There is no fixed rule against issuing declaratory relief when the same issue is presented to the court in other counts of the complaint. But little would be accomplished in this case by a declaratory judgment concerning an issue which is an element of the other causes of action. For this reason, the court declines to grant summary judgment to plaintiff on the declaratory judgment count.

## II.     Count Two – First Amendment Retaliation

Plaintiff seeks damages pursuant to 42 U.S.C. § 1983 for the termination of her employment in retaliation for her decision to speak out as a private citizen on a matter of public concern. To establish a First Amendment retaliation claim, a public employee must prove that "(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, 'so that it can be said that his speech was a motivating factor in the determination.'" *Feingold v. New York*, 366 F.3d 138, 160 (2d Cir. 2004) (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003).

### A. Dismissal

Plaintiff's summary judgment motion concerns only the element of adverse employment action. She seeks a ruling that the School Board dismissed her on June 12, 2020, when the Board placed her on paid leave, barred her from contact with the school community, and publicly

9

announced that her leadership was at an end. Defendant identifies the issuance of a 44-page ruling in October 2020 following a hearing before the Board as the date of termination.

The retaliation count requires proof that the employer took an adverse employment action. "In the context of a First Amendment retaliation claim, . . . only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Institute of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (citation and internal quotation marks omitted). The actions taken by the Board and Superintendent meet this standard. Less severe employment actions routinely qualify as "adverse," including "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Id.* at 226. It can hardly be disputed that the Board's conduct in June 2020 amounted to an adverse employment action.

Plaintiff seeks more than a ruling that she was subjected to an adverse employment action on June 12, 2020. She seeks a ruling that she was dismissed. This issue is relevant to a trial or other disposition of the case. Defendants argue that termination only occurred in October 2020 when the Board issued its written ruling. If the termination did not occur until after the Board's hearing, judicial review of the Board's action may be limited to the deferential review of the administrative record allowed by 3 V.S.A. § 815 and Vt. R. Civ. P. 74. If the administrative decision is upheld, the Board may take the position that any further consideration of the grounds for her termination is barred by principles of res judicata. On the other hand, if the Board dismissed Plaintiff on June 12 when the members announced that her leadership was at an end, then her path to a jury trial on the § 1983 claim lies open—subject, of course, to other potential issues raised by the defense.

The leading case defining which circumstances may support a finding of dismissal of a principal without a hearing conducted under 16 V.S.A. § 243 is *Herrera v. Union No. 39 Sch. Dist.*, 917 A.2d 923 (Vt. 2006). Principal Herrera also fell afoul of his superintendent and school board in the middle of his contract term. Following a meeting with the principal, the school board gave Herrera the choice of resigning with full pay and benefits or facing immediate termination. When he did not respond, the board "informed him that he would be placed on administrative leave until the board received his response." *Id.* at 927. Six weeks later the board met again and voted to place plaintiff on paid administrative leave for the remainder of the school year. Herrera demanded a hearing pursuant to 16 V.S.A. § 243. The board responded that no such hearing was available to challenge their decision to place him on leave. Herrera sued for deprivation of due process and breach of contract as well as other claims not relevant here. The Vermont Supreme Court held that "the District took actions that were tantamount to a mid-year dismissal of plaintiff from his position as principal." *Id.* at 929. The school board violated his employment contract and his rights under 16 V.S.A. § 243 by placing him on administrative leave without a hearing and a written decision establishing just cause for the dismissal. *Id.* at 931–32.

Despite the lesson of the *Herrera* case, the Mount Ascutney School Board and superintendent followed a virtually identical course. As in *Herrera*, the board met and placed the principal on administrative leave. In *Herrera*, the board met in person with the principal before announcing their decision. *Id.* at 927. Here, the board made its decision without meeting with Plaintiff. In both cases, the board placed the principal on administrative leave without taking a formal vote. In *Herrera*, the board engaged in some effort to maintain confidentiality, stating only that there were reasons "not fit for public review" for the termination. *Id.* In this

11

case, both the superintendent and the board members issued public statements on June 12, 2020, announcing the end of Plaintiff's leadership position. In both cases, the principals demanded a § 243 hearing. In *Herrera*, the board refused the plaintiff's request for a hearing related to his placement on administrative leave; in this case, the board conducted a hearing three months after placing Plaintiff on administrative leave.

*Hererra* identifies two routes by which school boards dismiss principals. One is by following the procedures set out at 16 V.S.A. § 243. The other is by placing the principal on administrative leave and announcing their intent "to end [the principal's] employment prior to the expiration of his contract." *Id.* at 931. In this case, as in *Hererra*, the public statements of intent by the school board and administration were unequivocal and are not challenged factually by Defendants. The court rejects Defendants' argument that efforts by Plaintiff to regain her position or her hope that she might not be terminated alter the effect of defendants' statements. The board chair's statement in her affidavit that "the Board did not agree about how to proceed concerning Ms. Riley's employment" is at odds with her contemporaneous statement that "we have voted unanimously to place Ms. Riley on paid leave, effective immediately, and we are resolved that she will no longer lead our school." (*Compare* Doc. 53-1 ¶ 8, *with* Doc. 9-5; Doc. 53 ¶ 39.) Any doubt as to the board's intention was removed in board chair Burrows's subsequent statements to the press: "We do not intend to hire [plaintiff] back" and "We wanted to make sure we acted as quickly as we possibly could." (Doc. 53 ¶¶ 50–51.)

Before ruling on this issue, the court considers whether there are contested facts which require a trial and preclude partial summary judgment on the issue of dismissal. Defendants argue that despite its public statement, the school board did not actually intend to dismiss Plaintiff on June 12. In her affidavit, school board chair Burrows states that "there was no

12

consensus among the Board members concerning whether or not to terminate Ms. Riley." (Doc. 53-1 ¶ 8.) She describes the board's intent to "put Ms. Riley on leave to put the escalating situation on pause and so that Ms. Riley would not be at School while we determined the next steps." (*Id.*) Ms. Burrows identifies a school board meeting on July 27, 2020, as the date when the board formally voted to terminate Ms. Riley's employment. Defendants also point to deposition testimony from Ms. Riley about her hope that she could be restored to employment. Defendants seek to depose friends and colleagues of Ms. Riley to find out what she may have told them about her understanding of the events and her employment status.

In determining whether the actions taken by the school board on June 12 amounted to a dismissal under the standards of *Herrera*, the court examines the actions and statements of the board when it placed Plaintiff on administrative leave. These are undisputed. That the board voted later on July 27 to dismiss Plaintiff and identified an expanded list of reasons for their action does not alter the events of June 12. Similarly, the private mental reservations about the proper course of conduct described by the board chair in her affidavit do not alter the public statement signed by all board members on June 12 and her own unequivocal statements to the press in the following days. The court is obliged to measure the undisputed events and public statements of June 12 against the legal standard for dismissal set by *Herrera*. In the absence of any dispute about the board's actions—and in light of objective conduct meeting the *Herrera* standard for when a dismissal occurs through action falling short of a formal vote and hearing— no factual dispute about whether the board dismissed Plaintiff remains for decision by the jury.

The court has considered Defendants' request for time to conduct discovery of friends of Plaintiff to learn what she may have told them about her understanding of the events of June 12. These statements—like Plaintiff's own account of why she believes she was terminated—are not

13

relevant to the narrow issue of whether the Board dismissed Plaintiff from her position. What matters in this case is what the Board did on June 12 and the days immediately following. This conduct and the reasons for it are established through objective evidence that is not in dispute. Plaintiff's personal beliefs about what the Board did—like the beliefs and opinions of the other participants—do not alter the record of the Board's actions and statements. If the Plaintiff's beliefs are irrelevant on this issue, then her description of these beliefs to other people is similarly irrelevant.

### B. Causation

Plaintiff also seeks a ruling that the sole basis for her dismissal was her two Facebook posts. "To establish causation, a plaintiff must show that the protected speech 'was a substantial motivating factor in the adverse employment action.'" *Cioffi v. Averill Park Central School Dist. Board of Ed.*, 444 F.3d 158 (2d Cir. 2006) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999), abrogated on other grounds by *Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012)). If the school board would have taken the same action anyway for reasons not implicating constitutional rights, causation may not be present. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Although by all accounts the two Facebook posts played a substantial role in Plaintiff's dismissal, Defendants have identified other reasons for their dissatisfaction including Plaintiff's communications before the graduation ceremony with a former student. At this early stage of the case, there is room for uncertainty about all of the factors contributing to the Board's decision and whether the Board has grounds for asserting a *Mt. Healthy* defense. The court will not issue a partial summary judgment ruling on the issue of causation.

14

For these reasons, the court grants partial summary judgment on Count Two (Retaliation). The court rules that the undisputed facts establish that Defendants terminated Plaintiff's employment as principal of the Windsor PK-12 School on June 12, 2020 when the Mount Ascutney School District Board placed Plaintiff on paid leave and issued a public announcement that "we are resolved that she will no longer lead our school."

### III. Count Three – Viewpoint Discrimination

Plaintiff has filed a separate count alleging "an adverse employment action against the Plaintiff based upon Plaintiff's protected speech," which she characterizes as "viewpoint discrimination." (Doc. 9 ¶ 66). There is no dispute that Defendants took an adverse employment action against plaintiff. To the extent that it becomes necessary to identify this action as the termination of employment, the court will follow the analysis concerning Count II and rule that the action was the dismissal of Plaintiff.

### IV. Count Four – Due Process

Plaintiff alleges that Defendants "violated Plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution by taking an adverse employment action against the Plaintiff without providing the Plaintiff a meaningful opportunity to refute the charges." (Doc. 9 ¶ 76.) As with Count III, there is no dispute that Defendants took an adverse employment action against plaintiff. There is no need at this time to identify the adverse action giving rise to Plaintiff's due process claim as the termination of Plaintiff's employment. To the extent that it becomes necessary later, the court will follow the analysis concerning Count III and rule that the action was the termination of employment.

15

## V. Count Five – Defamation

Under Vermont law, the elements of a defamation claim are "(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages." *Russin v. Wesson*, 2008 VT 22, ¶ 5, 949 A.2d 1019, 1020. Because the termination of Plaintiff's employment is not an element of the defamation claim, the court will not enter partial summary judgment on any aspect of the defamation claim.

## VI. Count Six – Breach of Employment Contract

Plaintiff was employed pursuant to a two-year contract which ran through June 2022. She alleges that she was dismissed from her position or, alternatively, that she was constructively discharged on June 12, 2020, and that she submitted a request for a hearing pursuant to 16 V.S.A. § 243(d) on June 25, 2020. Section 243(d) provides that, upon receiving notice of dismissal, a principal "shall be given an opportunity to request in writing a hearing within the 15 days following delivery of the notice," and "[w]ithin 15 days following receipt of a request for hearing from the principal, the board shall conduct such a hearing." 16 V.S.A. § 243(d). Plaintiff alleges that Defendants violated § 243(d) by not providing her a hearing within the required period. Defendants respond that Plaintiff was not dismissed until July 27, 2020 when "the Board voted at a meeting to terminate [Plaintiff], pending the outcome of a Board hearing pursuant to § 243(d), which occurred on September 10." (Doc. 52 at 11.) Defendants also contend that the 15-day deadline for the hearing is directory, not mandatory. (Doc. 52 at 18.)

The only issue on which Plaintiff seeks partial summary judgment is the date of dismissal. The court rules that this occurred on June 12, 2020. Issues concerning the

consequences of the late hearing are not before the court at this time. The court will grant partial summary judgment on the limited issue of when the termination occurred.

## Conclusion

The court GRANTS the motion for partial summary judgment as it affects proof of the elements of the claims of retaliation (Counts II and III), due process (Count IV), and breach of contract (Count VI). With respect to each of these counts, the court rules that the plaintiff has provided sufficient evidence, undisputed by the defendants, to establish that the Board's actions on June 12, 2020 terminated her employment with the School District.

Dated at Rutland, in the District of Vermont, this 15th day of March, 2021.

Geoffrey W. Crawford, Chief Judge
United States District Court